**FEDERAL NATIONAL MORTGAGE ASSOCIATION, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 00–369T.

United States Court of Federal Claims.

April 2, 2003.

229

Thomas D. Johnston and Alan I. Horowitz, Miller & Chevalier, Chartered, Washington, D.C., attorneys of record for plaintiff.

William K. Drew, with whom were Assistant Attorney General Eileen J. O'Connor and Chief Mildred L. Seidman, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

This tax refund suit is before the court after oral argument on cross-motions for partial summary judgment. At issue is whether the taxpayer is entitled to application of a zero net interest rate to overlapping periods of mutual indebtedness between the taxpayer and the government in connection with tax years 1974, 1975, 1983, and 1986. For the reasons set forth below, plaintiff's motion for partial summary judgment is granted and defendant's cross-motion is denied.

## FACTS

Plaintiff, Federal National Mortgage Association ("Fannie Mae"), provides liquidity for mortgage investments, primarily by purchasing mortgages from lenders with funds generated through the issuance of equity and debt securities. Originally created as a federal government agency, Fannie Mae became a privately owned, for-profit entity in 1968.

In February 1994, pursuant to its opinion in *Federal Nat'l Mortgage Ass'n v. Commissioner,* 100 T.C. 541, 1993 WL 210390 (1993), the United States Tax Court determined that Fannie Mae had overpaid its 1974 income taxes by $81,760,551 and its 1975 income taxes by $51,691,622. *See Federal Nat'l Mortgage Ass'n v. Commissioner,* No. 21557–86 (T.C. Feb. 23, 1994). These amounts, together with previously assessed deficiency interest and overpayment interest, were refunded in several installments between August 1994 and November 1996. The overpayments overlapped with several years during which Fannie Mae had paid deficiency interest to the Internal Revenue Service ("IRS") on income tax underpayments involving tax years 1983 and 1986. However, because the IRS collects interest on underpayments at a higher rate than it pays interest on overpayments, during the periods of overlap, a net liability on Fannie Mae's part arose despite the fact that no net tax was due. Specifically, a net liability of approximately $4,940,328 is attributable to the overlap between the 1983 underpayments and the 1974 overpayments, and a net liability of approximately $5,588,173 is attributable to the overlap between the 1986 underpayments and both the 1974 and 1975 overpayments.

In December 1999, Fannie Mae filed an administrative claim with the IRS pursuant to I.R.C. § 6621(d).[1] Passed as part of the IRS Restructuring and Reform Act of 1998 ("the Act"), Pub.L. No. 105–206, 112 Stat. 685, section 6621(d) authorizes the IRS to apply a zero net interest rate to overlapping periods of mutual indebtedness between a taxpayer and the IRS, *i.e.,* "global interest netting." Section 6621(d) provides:

**Elimination of interest on overlapping periods of tax overpayments and under-**

1. The Internal Revenue Code comprises Title 26    of the United States Code.

payments.—To the extent that, for any period, interest is payable under subchapter A and allowable under subchapter B on equivalent underpayments and overpayments by the same taxpayer of tax imposed by this title, the net rate of interest under this section on such amounts shall be zero for such period.

I.R.C. § 6621(d).[2] Although section 6621(d) did not go into effect until July 22, 1998, the date of enactment, the Act's uncodified special rule permits taxpayers to seek global interest netting for taxable periods commencing before July 22, 1998, as follows:

Special rule.—Subject to any applicable statute of limitation not having expired with regard to either a tax underpayment or a tax overpayment, the amendments made by this section shall apply to interest for periods beginning before the date of the enactment of this Act if the taxpayer—

(A) reasonably identifies and establishes periods of such tax overpayments and underpayments for which the zero rate applies; and

(B) not later than December 31, 1999, requests the Secretary of the Treasury to apply section 6621(d) of the Internal Revenue Code of 1986 ... to such periods.

Pub.L. No. 105–206, § 3301(c)(2), 112 Stat. 685, 741 (1998), *amended by* Pub.L. No. 105–277, § 4002(d), 112 Stat. 2681, 2681–906 (1998).

The IRS disallowed Fannie Mae's claim on June 7, 2000 (with a corrected notice of disallowance issued on July 20, 2000). In support of its determination, the IRS relied on its Revenue Procedure 99–43, 1999 WL 1019050, which interprets the Act's special rule as requiring that "both periods of limitation applicable to the tax underpayment and to the tax overpayment ... must have been open on July 22, 1998." *See* Rev. Proc. 99–43, 1999–47 I.R.B. 579, 580, 1999 WL 1019050. According to the IRS, Congress intended to provide for retrospective application of section 6621(d) only if, as of July 22, 1998, the statutes of limitations on both "legs" of the overlapping mutual liabilities remained open. The IRS agreed that the six-year statute of limitations for recovery of overpayment interest for tax years 1974 and 1975 had been open on July 22, 1998,[3] but concluded that because the statute of limitations for the 1983 and 1986 underpayment years had closed,[4] Fannie Mae's claim fell outside the purview of the Act's special rule.[5]

Fannie Mae disputes the IRS's interpretation of the Act's special rule. Plaintiff reads the condition "[s]ubject to any applicable statute of limitation not having expired with regard to either a tax underpayment or a tax overpayment" as authorizing the IRS to perform global interest netting as long as the statute of limitations has not closed on *either* the overpayment period *or* the underpayment period. Because the overpayment years were not time barred on July 22, 1998, Fannie Mae now seeks to compel the IRS to refund either an additional $9,924,876 in overpayment interest or funds otherwise implementing a zero net interest rate, as well as statutory interest and costs.

## DISCUSSION

The issue for resolution is the correct interpretation of the special rule that extends the interest-netting benefits of section 6621(d) to past periods. This is a question of first impression in the federal courts. Narrowly viewed, the parties' controversy cen-

---

2. Subchapters A and B of the Internal Revenue Code comprise the provisions relating to interest on underpayments and overpayments of tax, respectively. *See* I.R.C. §§ 6601, 6611.

3. The Internal Revenue Code does not provide a statute of limitations for seeking the recovery of overpayment interest. Instead, a claim for additional interest allowable on a tax overpayment is subject to the six-year period provided for by 28 U.S.C. §§ 2401, 2501. *See* Rev. Rul. 56–506, 1956–2 C.B. 959, 1956 WL 11820.

4. A claim for credit or refund of interest paid on a tax underpayment generally must be filed within three years from the date the tax return was filed or within two years from the date on which the interest was paid, whichever expires later. *See* I.R.C. § 6511.

5. Fannie Mae disagrees with the IRS's conclusion that the statute of limitations for the 1983 underpayment year was closed on July 22, 1998. In view of the conclusions set forth in this opinion, this factual dispute is moot.

ters on the meaning of the introductory language of the special rule, which makes a zero net interest rate available "[s]ubject to any applicable statute of limitation not having expired with regard to either a tax underpayment or a tax overpayment." In order to reach a proper interpretation of the proviso's meaning, an analysis of both the special rule and of section 6621(d) itself is necessary.

## I.

### A.

Given that no federal court has yet explored the meaning of the special rule or section 6621(d), an examination of the circumstances leading to their enactment is warranted. Since 1986, the IRS has collected interest on tax underpayments by corporate taxpayers at a higher rate than it pays interest on tax overpayments. *See* Tax Reform Act of 1986, Pub.L. No. 99–514, § 1511(a), 100 Stat.2085, 2744.[6] The interest rate on corporate tax underpayments currently ranges from three percentage points over the federal short-term interest rate (for underpayments of $100,000 or less)[7] to five percentage points over the federal short-term rate (for underpayments exceeding $100,000). *See* I.R.C. § 6601(a) (mandating payment of interest on underpayments); I.R.C. §§ 6621(a)(2), 6621(c) (fixing rates). The interest rate on corporate tax overpayments of $10,000 or less is the federal short-term rate plus two percentage points, reduced to 0.5 percentage points for overpayments exceeding $10,000. *See* I.R.C. § 6611(a) (mandating payment of interest on overpayments); I.R.C. § 6621(a)(1) (fixing rates). Consequently, a corporate taxpayer that makes a tax underpayment exceeding $100,000 will pay interest at a rate 4.5 percent higher than the rate the government would pay on an equivalent overpayment.

The IRS routinely uses certain means of minimizing taxpayer liability in situations of mutual indebtedness. First, the IRS offsets outstanding overpayments of tax against balances due and unpaid. *See* I.R.C. § 6402(a) ("In the case of any overpayment, the Secretary ... may credit the amount ... against any liability in respect of an internal revenue tax ...."). Although the IRS's offsetting power is discretionary, its policy is to offset all outstanding overpayments and underpayments that simultaneously register on its master system. *See* IRS Notice 96–18, 1996–14 I.R.B. 27, 1996 WL 121249. Because I.R.C. § 6601(f) directs that no interest be imposed for any portion of a tax thus satisfied, no net interest liability is generated via offsetting. Second, since 1994, the IRS has implemented "annual netting," where a taxpayer is not charged the interest rate differential on an underpayment that is satisfied by credit of an overpayment arising during the same taxable year. *See* Rev. Proc. 94–60, 1994–2 C.B. 774, 1994 WL 477288. Unlike offsetting, annual netting does not require that both the overpayment and the underpayment be currently outstanding. *Id.*

In all other cases where either the underpayment or the overpayment has been satisfied, the IRS's practice is to assess or credit interest on each liability separately at the applicable statutory rate. In these circumstances, an overlapping mutual obligation between the IRS and a taxpayer will generate a net liability on the taxpayer's part, even where the amounts of the underpayment and of the overpayment are identical. This outcome is consistent with the IRS's longstanding practice of treating each tax liability as separate and distinct, a position that has been upheld by the federal courts on several occasions. *See, e.g., Babcock & Wilcox Co. v. Pedrick*, 212 F.2d 645, 649 (2d Cir.1954), *cert. denied*, 348 U.S. 936, 75 S.Ct. 355, 99 L.Ed. 733 (1955) (holding that the federal excess profits tax and the income tax were "imposed by separate legislation separately enacted" and that interest ran on an underpayment of the former despite a subsequent overpayment of the latter); *accord United States v. Hecla Mining Co.*, 302 F.2d 204, 213 (9th

---

6. From 1986 to 1998, this rule applied to corporate and individual taxpayers alike. The 1998 amendments to the Internal Revenue Code eliminated the interest differential for individual taxpayers. *See* I.R.C. § 6621(a)(1)(B).

7. The federal short-term rate is determined by the Secretary of the Treasury pursuant to I.R.C. § 1274(d)(1)(B) and according to standards set forth in I.R.C. § 1274(d)(1)(C)(i).

Cir.1961), *cert. denied*, 370 U.S. 918, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); *see also Commissioner v. Sunnen*, 333 U.S. 591, 598, 68 S.Ct. 715, 92 L.Ed. 898 (1948) (finding that each tax year constitutes a new liability and a discrete cause of action). Nonetheless, the IRS's position has been criticized as requiring a taxpayer to pay net interest where no net tax is due.

### B.

Upon enacting the interest differential in 1986, Congress demonstrated sensitivity to this criticism. The Conference Report accompanying that enactment noted that the new law provided Treasury with three years during which to prescribe regulations providing for the netting of overpayments and underpayments. *See* H.R. Conf. Rep. No. 99–841, pt. 4, at 785 (1986), U.S.Code Cong. & Admin.News 1986, at 4075, 4873. By the end of this period, the report stated, "the IRS should have implemented the most comprehensive netting procedures that are consistent with sound administrative practice." *Id.* In 1990, Congress both increased the interest differential and reiterated its desire that the IRS establish comprehensive netting procedures. H.R. Conf. Rep. No. 101–964, at 1101 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2374 (accompanying the Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, 104 Stat. 1388). By 1994, in conjunction with yet another increase, Congress urged the IRS to act "as rapidly as possible." S.Rep. No. 103–412, at 144 (1994) (accompanying the Uruguay Round Agreements Act, Pub.L. No. 103–465, 108 Stat. 4809 (1994)).

Throughout this period, however, the IRS maintained that it lacked authority to perform the sort of "global netting" envisioned by Congress. Global netting combines and expands the offsetting and annual netting approaches. Like offsetting, global netting balances a taxpayer's overpayment against its underpayment of a different tax liability, including liabilities from different tax years. But like annual netting, global netting can be used where the balance payable and/or the balance due are no longer outstanding. Two approaches to global netting exist. The first approach extends I.R.C. § 6402(a)'s off-setting power by using I.R.C. § 6601(f) to nullify the interest differential between a previously refunded overpayment and a tax deficiency, or between an overpayment and a previously paid deficiency. The second approach is interest equalization, which simply manipulates interest rates in order to achieve a net rate of zero for the periods during which overpayments overlap with underpayments due. Actual tax balances are not affected by this second approach, which does not rely on the IRS's offsetting authority. Rather, netting is accomplished either by reducing the amount of underpayment interest below the statutory rate (to match the overpayment rate), or by increasing the amount of overpayment interest above the statutory rate (to match the underpayment rate).

The IRS claimed that neither the offsetting nor the interest equalization approach was permissible absent additional statutory authority. The IRS conceded that section 6601(f) required the netting of interest where the IRS opted to use section 6402(a)'s offsetting power. However, Treasury regulations implementing section 6402(a) interpreted the term "liability" to mean "outstanding liability." *See* Treas. Reg. § 301.6402–1 (2002). Because a fully paid tax liability could no longer be considered outstanding, circumstances requiring global netting necessarily would fall outside the purview of section 6402(a) and fail to trigger section 6601(f). *See* Michael I. Saltzman, *IRS Practice and Procedure* ¶ 6.02[3][d] n. 127 (rev.3d ed.2002). The Eighth Circuit upheld this reading of the statute in *Northern States Power Co. v. United States*, 73 F.3d 764, 767 (8th Cir.), *cert. denied*, 519 U.S. 862, 117 S.Ct. 168, 136 L.Ed.2d 110 (1996), relying principally on the obligation of the federal courts to defer to Treasury regulations interpreting provisions of the Internal Revenue Code. *Id.* (citing *Cottage Sav. Ass'n v. Commissioner*, 499 U.S. 554, 560–61, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991)).

The IRS also maintained that it lacked authority to apply an interest equalization approach to global netting. The mandatory language of the interest-setting sections of the Internal Revenue Code, it argued, re-

quired application of the specific rates set forth in section 6621. Thus, the IRS argued, it was outside the IRS's authority to adjust either the overpayment or the underpayment rate for global netting or for any other purpose. *See* I.R.C. § 6601(a) (interest "shall be paid" at "the underpayment rate established under section 6621"); I.R.C. § 6611(a) (interest "shall be allowed and paid" at "the overpayment rate established under section 6621").

In July 1996, Congress commissioned a study of global interest netting by the Secretary of the Treasury. *See* Taxpayer Bill of Rights 2, Pub.L. No. 104–168, § 1208, 110 Stat. 1453, 1473 (1996).[8] The study, completed jointly by Treasury's Office of Tax Policy and the IRS, was submitted to Congress in April 1997. *See* Department of the Treasury, Office of Tax Policy, *Report to the Congress on Netting of Interest on Tax Overpayments and Underpayments* (1997) ("Treasury Report"). The Treasury Report reiterated the IRS's claim that it lacked statutory authority to perform global netting and concluded that several limitations would be appropriate should Congress choose to grant it that power. First, the Treasury Report recommended the interest equalization approach over an extension of the offsetting power. *Id.* at 41. According to the IRS, this methodology would require at least one non-zero-balance year (*i.e.*, an outstanding balance for one "leg" of the overlap). *Id.* Second, the report advised that global netting be limited to income taxes only. *Id.* at 41–42. Third, and most significantly for the purposes of this lawsuit, the report urged that global netting "should apply only to tax years that are not barred by statute," citing principles of finality and other more practical concerns. *Id.* at 42. In particular, the report noted that "interest computations are often extremely difficult and complex to perform even in the comparatively straightforward annual netting and offsetting situations." *Id.* at 1. Given the IRS's computer and other storage limitations, "substantial" administrative difficulties would arise from the inclusion of time-barred years. *Id.* at 42. Fourth, the

report recommended that global interest netting be performed only upon a taxpayer's request, that the taxpayer be obligated to furnish the IRS with the necessary documentation, and that global netting be performed only once with respect to any tax year. *Id.* Fifth, and finally, the report requested additional appropriations to fund the costs that would be associated with implementing the new practice, as well as a phase-in period of two years. *Id.* at 43.

### C.

In section 6621(d), introduced in the House of Representatives in October 1997 and enacted into law the following July, Congress adopted the interest equalization approach to global netting but rejected the remainder of the Treasury Report's recommendations in whole or in part. The new statute neither required one non-zero-balance year nor limited global netting to income taxes only. Rather, global netting was made available "for any period" and for any "tax imposed by this title." I.R.C. § 6621(d). Additionally, Congress declined to place the burden of seeking global netting on the taxpayer, requiring instead that the IRS automatically apply a zero net interest rate to overlapping liabilities. *Id.*

The new statute also provided for retrospective application of global interest netting—a possibility the Treasury Report did not address. The original bill (H.R.2676) operated purely prospectively. *See* H.R.Rep. No. 105–364(I), at 21 (1997). However, a Senate floor amendment to the bill in May 1998 added the special rule that permits taxpayers to seek global interest netting for taxable periods commencing before the effective date of section 6621(d):

> **Special rule.**—Subject to any applicable statute of limitation not having expired with regard to either a tax underpayment or a tax overpayment, the amendments made by this section shall apply to interest for periods beginning before the date of the enactment of this Act if the taxpayer—

---

8.  At the time of the statutory commission, Treasury and the IRS already had initiated a similar study. *See* IRS Announcement 96–5, 1996–4 I.R.B. 99, 1996 WL 2203; IRS Notice 96–18, 1996–14 C.B. 370, 1996 WL 121249.

(A) reasonably identifies and establishes periods of such tax overpayments and underpayments for which the zero rate applies; and

(B) not later than December 31, 1999, requests the Secretary of the Treasury to apply section 6621(d) of the Internal Revenue Code of 1986 ... to such periods. 144 Cong. Rec. S4,546 (daily ed. May 7, 1998). Inexplicably, the enrolled version of the bill omitted the introductory language in the special rule addressing statutes of limitations and provided only that "[t]he amendments made by this section shall apply to interest for periods beginning before the date of the enactment of this Act." Pub.L. No. 105–206, § 3301(c)(2), 112 Stat. at 741. There is no reason, however, to believe that the omission was anything but inadvertent. The legislative history reveals no discussion about the missing proviso between the final conference report and the enactment of section 6621(d), and the clause was reinserted without fanfare a few months later, via technical correction. *See* Pub.L. No. 105–277, § 4002(d), 112 Stat. 2681, 2681–906 (1998). Congress turns to technical corrections when it wishes to clarify existing law or repair a scrivener's error, rather than to change the substantive meaning of the statute. *Wilhelm Pudenz, GmbH v. Littlefuse, Inc.,* 177 F.3d 1204, 1210–11 (11th Cir.1999); *In re Chateaugay Corp.,* 89 F.3d 942, 954 (2d Cir.1996).

## II.

■ It is axiomatic that the starting point for an exercise in statutory interpretation is the language of the statute itself. *Duncan v. Walker,* 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *Williams v. Taylor,* 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). And when the statutory text "speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is ended." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *see also Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 788 (Fed. Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988) ("It is a general rule of statutory construction that where Congress has clearly stated its intent in the language of a statute, a court should not inquire further.").

Both plaintiff and defendant focus on the opening language of the special rule: "Subject to any applicable statute of limitation not having expired with regard to either a tax underpayment or a tax overpayment ...." Each party has acknowledged that the language is ambiguous, "convoluted," and "awkwardly written." This language lends itself equally to two divergent interpretations: either it imposes a restriction on the availability of global interest netting for past periods (defendant's position), or it simply clarifies that general statute of limitations rules apply retrospectively as well as prospectively (plaintiff's position). Congress's choice of the expansive word "any" exacerbates the interpretive difficulties. Because "any" may mean both "one" and "all," Webster's II New College Dictionary 51 (1995), it is impossible to tell from the plain language of the statute whether Congress intended that the expiration of any statute of limitations renders a claim beyond the purview of the special rule, or that as long as any statute of limitations remains open, the special rule is applicable.

Because the statute is unclear, defendant urges the court to rely on the IRS's Revenue Procedure 99–43, 1999–47 I.R.B. 579, 1999 WL 1019050, which states unambiguously that the special rule applies only where "both applicable periods of limitation ... were open on July 22, 1998." *Id.* at 580. This we cannot do. Revenue Procedure 99–43, 1999 WL 1019050 is an interpretive rule that is not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Moreover, although the doctrine of *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), entitles a revenue procedure to weight proportional to its "power to persuade," *id.* at 140, 65 S.Ct. 161, the IRS's reasoning set forth in Revenue Procedure 99–43, 1999 WL 1019050 is not persuasive.

## A.

■ There is little basis for defendant's claim that IRS revenue procedures are "like-

ly" entitled to deference under the *Chevron* doctrine. The Supreme Court has made clear that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and *enforcement guidelines,* all of which lack the force of law—do not warrant *Chevron*-style deference." *Murakami v. United States,* 52 Fed.Cl. 232, 237 n. 3 (2002) (quoting *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)) (emphasis added). A revenue procedure is plainly an "enforcement guideline." Nevertheless, defendant argues that "[a]lthough interpretations of statutes are usually set forth in revenue rulings, such interpretations may also, as here, be set forth in revenue procedures where the interpretative question bears upon a procedural matter."

Leaving aside the question of whether the existence of a right to global interest netting is truly a "procedural" rather than a "substantive" matter, defendant's statement conflicts with the definitions of revenue procedures and revenue rulings as set forth in Treasury regulations. Those regulations define a "revenue ruling" as "an official interpretation by the [IRS] ... published for the information and guidance of taxpayers, [IRS] officials, and others concerned." Treas. Reg. § 601.601(d)(2)(i)(a) (2002). In comparison, a "revenue procedure" is defined as "a statement of procedure that affects the rights or duties of taxpayers or other members of the public under the Code and related statutes or information that, although not necessarily affecting the rights and duties of the public, should be a matter of public knowledge." Treas. Reg. § 601.601(d)(2)(b) (2002). No statutory interpretation function is ascribed to revenue procedures.[9]

The Court's decision in *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), does not disturb this conclusion. *Mead* held that *Chevron* deference was reserved to situations where the statutory scheme incorporated an explicit or implicit congressional delegation of authority to produce interpretations invested with the force of law. *Id.* at 229, 121 S.Ct. 2164. The Court did not define the markings of an implicit delegation, but it identified the requirement of formal notice-and-comment rulemaking or formal adjudication as "a very good indicator of delegation meriting *Chevron* treatment." *Id.* (citing *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)); *see also Koyo Seiko Co. v. United States,* 258 F.3d 1340 (Fed.Cir.2001) (finding an implicit delegation where regulations were issued under a notice-and-comment procedure). Although the Court also noted that "we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded," *Mead,* 533 U.S. at 231, 121 S.Ct. 2164, it cited in support of that proposition *NationsBank of N.C.N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 256–57, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995), a case limited to the Comptroller of the Currency's long-standing personal authority to enforce the banking laws and promulgate directives with the force of law.

Treasury regulations undoubtedly enjoy *Chevron* deference. *See United States v. Correll,* 389 U.S. 299, 306–307, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967). But no body of precedent extends the same courtesy to revenue procedures. Indeed, the IRS makes a point of explaining in the introduction to each issue of the Internal Revenue Bulletin that "[revenue rulings] and procedures reported in the Bulletin do not have the force and effect of Treasury Department Regulations." *See, e.g.,* Introduction, 2003–12 I.R.B. The decision in *American Express Co. v. United States,* 262 F.3d 1376 (Fed.Cir.2001), does not suggest otherwise. In that case, the Court of Appeals for the Federal Circuit "[was] not dealing with an agency's interpre-

---

9. Decisions to extend *Chevron* deference to revenue rulings are therefore of limited utility. *See, e.g., Ammex, Inc. v. United States,* No. 00–CV–73388, 2002 WL 32065583 (E.D.Mich. July 31, 2002). Moreover, no such conclusion appears forthcoming from the Court of Appeals for the Federal Circuit, which has held that revenue rulings have no binding effect. *See B.F. Goodrich Co. v. United States,* 94 F.3d 1545, 1550 n. 5 (Fed.Cir.1996) (citing *Trainer v. United States,* 800 F.2d 1086, 1090 n. 7 (Fed.Cir.1986); *Farmar v. United States,* 231 Ct.Cl. 642, 689 F.2d 1017, 1024 n. 12 (1982)).

tation of a statute and issues of Chevron deference, but with the IRS's interpretation of an ambiguous term in its own Revenue Procedure. *In such circumstances,* substantial deference is paid to an agency's interpretations reflected in informal rulings." *Id.* at 1382–83 (citing *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Cleveland Indians Baseball Co.,* 532 U.S. 200, 220, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001); *Southern Cal. Edison Co. v. United States,* 226 F.3d 1349, 1356–57 (Fed. Cir.2000)) (emphasis added).

Defendant argues that because Revenue Procedure 99–43, 1999 WL 1019050 was promulgated pursuant to a centralized process, including several levels of internal review, it is entitled to *Chevron* deference. On this point, we note that although it was not required to do so, the IRS subjected Revenue Procedure 99–43 to limited notice and comment. *See* Rev. Proc. 99–19, 1999–13 I.R.B. 12, 1999 WL 138793.[10] But the issue is not whether the IRS voluntarily subjected Revenue Procedure 99–43, 1999 WL 1019050 to a measure of formalized review. Instead, the issue is whether Congress intended for the IRS to do so. As the Supreme Court explained in *Mead,* "[i]t is fair to assume generally that *Congress* contemplates administrative action with the effect of law when *it* provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Mead,* 533 U.S. at 230, 121 S.Ct. 2164 (emphasis added). Similarly, defendant's emphasis on the fact that the IRS publishes its revenue procedures in the Internal Revenue Bulletin is misplaced. The IRS publishes its revenue procedures not pursuant to congressional mandate, but rather because it simply opts to do so. "It is the *policy* of the [IRS] to publish in the Bulletin all substantive and procedural rulings of importance or general interest, the publication of which is considered necessary to promote a uniform applica-

tion of the laws administered by the [IRS]." Treas. Reg. § 601.601(d)(1) (2002) (emphasis added). Congress may delegate its lawmaking authority to an administrative agency, but the agency may not assume such authority on its own.

### B.

■ Although not controlling, revenue procedures, like other interpretive regulations, "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Mead,* 533 U.S. at 227, 121 S.Ct. 2164 (quoting *Skidmore,* 323 U.S. at 139–40, 65 S.Ct. 161). The *Mead* Court listed the factors to be taken into account by a federal court when analyzing the interpretive choices of an administrative agency:

> The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position.

*Id.* at 228, 121 S.Ct. 2164 (citing *Skidmore,* 323 U.S. at 139–40, 65 S.Ct. 161) (footnotes omitted). We examine these factors in turn.

■ Revenue Procedure 99–43, 1999 WL 1019050 simply states the IRS's position. No reasoning is given. Therefore, defendant cannot argue in favor of either the thoroughness or the validity of its interpretation of the special rule. *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 288 n. 5, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978) ("[T]he mere promulgation of a regulation, without a concomitant exegesis of the statutory authority for doing so, obviously lacks 'power to persuade' as to the existence of such authority.").

The consistency of an IRS interpretive rule with earlier pronouncements has been an important factor in Supreme Court cases upholding IRS interpretive rulings. In *Davis v. United States,* 495 U.S. 472, 110

---

**10.** The IRS, however, did not call for comments addressing the statute of limitations issue. Rather, its request was limited to submissions "regarding the level of specificity necessary to reasonably identify and establish on or before December 31, 1999, the period(s) for which an equivalent amount of overpayment and underpayment of tax overlap when the taxpayer cannot provide by December 31, 1999, a final computation of how the net interest rate of zero applies to interest accruing before October 1, 1998." *Id.*

S.Ct. 2014, 109 L.Ed.2d 457 (1990), the Court observed:

> Although the [IRS's] interpretive rulings do not have the force and effect of regulations, *see Bartels v. Birmingham,* 332 U.S. 126, 132, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), we give an agency's interpretations and practices considerable weight where they involve the contemporaneous construction of a statute *and* where they have been in long use. *See, e.g., Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

*Id.* at 484, 110 S.Ct. 2014 (emphasis added). Similarly, in *Cleveland Indians Baseball Co.,* 532 U.S. 200, 121 S.Ct. 1433, the Court, while declining to consider whether IRS revenue rulings are entitled to deference as a group, upheld a particular revenue ruling because of its status as "an agency's steady interpretation of its own 61–year–old regulation implementing a 62–year–old statute." *Id.* at 220, 121 S.Ct. 1433. In comparison, because Revenue Procedure 99–43 is a recent pronouncement implementing a new statute with no precedent in the tax laws, it cannot claim consistency with earlier positions.

Moreover, the IRS's interpretation of the special rule appears inconsistent with its revenue procedure addressing section 6621(d). In Revenue Procedure 2000–26, 2000–1 C.B. 1257, 2000 WL 675152, the IRS authorizes netting for future periods even where one of the overlapping years is time-barred. *Id.* at 1258 ("[T]axpayers should request the net interest rate of zero ... on or before the date on which the last applicable period of limitation ... closes."). No explanation for the discrepancy appears on the face of either procedure.

Because Revenue Procedure 99–43 contains no reasoning, cannot claim validity as a long-standing interpretation, and arguably conflicts with other IRS statements of procedure, we afford it little weight.

### C.

Because *Chevron* deference does not apply, we also examine the legislative history behind section 6621(d) and the special rule. *See Shell Petroleum, Inc. v. United States,* 47 Fed.Cl. 812, 817 (2000) (citing *New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)). Unfortunately, that history is not only sparse, but also ambiguous.

As mentioned earlier, the special rule came about as the result of a Senate floor amendment that occurred relatively late in the events leading up to the enactment of section 6621(d). A description of the statute of limitations proviso is contained in the Conference Report dated June 24, 1998: "[T]he provision applies to interest for periods beginning before the date of enactment if: (1) the statute of limitations has not expired with respect to either the underpayment or overpayment ...." H.R. Conf. Rep. No. 105–599, at 257 (1998). According to plaintiff, this description "even more plainly supports Fannie Mae's position." Not surprisingly, defendant disagrees, suggesting that "[t]his language is more naturally read as indicating that both periods must be open." In the court's opinion, the proffered language lends itself equally to both parties' interpretations and is therefore of little value here.

Next, we turn to the technical amendment to the special rule. Plaintiff claims that defendant's interpretation would impermissibly narrow the scope of the special rule beyond the appropriate role of a technical correction. This argument is without merit under the circumstances of this case, where the statute was amended by the enacting Congress and only three months after it was promulgated. Here, the technical correction served to repair a scrivener's error, not to close an inadvertently created and subsequently exploited loophole. Contrary to plaintiff's contentions, a technical correction that merely restores the rule Congress intended to enact cannot be construed as a fundamental change in the operation of the statute.

Defendant relies heavily on the 1997 Treasury Report to support its interpretation of the proviso in the special rule. According to defendant, because the Treasury Report recommended that time-barred years be excluded from global interest netting, it is unreasonable to assume that Congress concluded

otherwise absent specific refutation. The court disagrees. We note first that the Treasury Report was authored by Treasury and the IRS, not by members of Congress, and therefore does not qualify as legislative history. Second, it is clear that Congress rejected most of the Treasury Report's recommendations, preferring a much more expansive approach. Perhaps the most striking example is the fate of the report's recommendation that global interest netting be restricted to income taxes. Third, the Treasury Report devotes no discussion to the possibility of retrospective interest netting.[11]

Finally, defendant points to the General Explanation of Tax Legislation Enacted in 1998, prepared by the Joint Committee on Taxation, November 24, 1998 (the "Blue Book"). This court has cautioned that the Blue Book and other post-enactment explanations "are not legislative history at all." *Sharp v. United States*, 27 Fed.Cl. 52, 59 (1992), *aff'd*, 14 F.3d 583 (Fed.Cir.1993); *accord Flood v. United States*, 33 F.3d 1174, 1178 (9th Cir.1994); *Estate of Wallace v. Commissioner*, 965 F.2d 1038, 1050 n. 15 (11th Cir.1992). Although this court customarily will consider the Blue Book when construing a tax statute, *see, e.g., Bank of Clearwater v. United States*, 7 Cl.Ct. 289, 294 (1985), we find it unhelpful in this case. The Joint Committee translates the effective date proviso to mean that retrospective global interest netting will be available if, "as of the date of enactment, a statute of limitations has not expired with respect to the underpayment or overpayment." General Explanation of Tax Legislation Enacted in 1998, Joint Committee on Taxation, November 24, 1998, at 74. This rewording is no more helpful than that of the Conference Report, in that it may mean either as long as *any* statute of limitations has not expired or as long as *no* statute of limitations has expired.

### III.

Because the scope of the special rule cannot be resolved by reference to the plain meaning of the statutory text, and because the legislative history behind section 6621(d) and the special rule does not clearly demonstrate Congress's intent, we must resort to other methods of statutory interpretation. In doing so, we have found two compelling principles supporting the conclusion that the special rule applies as long as at least one of the applicable statutes of limitations remains open.

First, we take note of a long-standing rule of statutory construction: where the plain meaning of a tax statute cannot be ascertained, "the doubt must be resolved against the government and in favor of the taxpayer." *United States v. Merriam*, 263 U.S. 179, 188, 44 S.Ct. 69, 68 L.Ed. 240 (1923); *see also Xerox Corp. v. United States*, 41 F.3d 647, 658 (Fed.Cir.1994) (citing *Hassett v. Welch*, 303 U.S. 303, 314, 58 S.Ct. 559, 82 L.Ed. 858 (1938); *Auto–Ordnance Corp. v. United States*, 822 F.2d 1566, 1571 (Fed.Cir.1987)); *Renick's Estate v. United States*, 231 Ct.Cl. 457, 687 F.2d 371, 376 (1982). This maxim is complimented by the principle that remedial statutes should be interpreted broadly in order to effectuate congressional goals. *Smith v. Brown*, 35 F.3d 1516, 1525 (Fed.Cir.1994) (citing *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 268, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); *Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 98 L.Ed. 5 (1953)). There is no doubt that a key purpose of section 6621(d) and the special rule was to remedy a perceived injustice in the tax laws. *See* S.Rep. No. 105–174, at 61–62 (1998) ("The Committee does not believe that the different interest rates provided for overpayments and underpayments were ever intended to result in the charging of the differential on periods of mutual indebtedness."); H.R.Rep. No. 105–364I, at 64 (1997) (same). Indeed, these provisions were part of the Internal Revenue

---

11. Defendant disagrees, arguing that the Treasury Report's examination of the administrative difficulties presented by the inclusion of time-barred years in global interest netting calculations makes sense only if the report was assuming that pre-enactment periods would be covered by a statute authorizing global netting. But there is no basis for the assumption that statute of limitations issues simply would not have come up in a discussion of global interest netting limited to future periods. Indeed, the IRS itself, in Revenue Procedure 2000–26, 2000 WL 675152, recognizes that time-barred years commonly are taken into account in post-enactment netting.

**239**

Service Restructuring and *Reform* Act of 1998.

Second, "[w]hen interpreting ambiguous statutory tax provisions, it is appropriate to analyze other related tax provisions and seek an interpretation consistent with the tax statute viewed as an 'organic whole.'" *Reese v. United States,* 28 Fed.Cl. 702, 707 (1993), *aff'd,* 24 F.3d 228 (Fed.Cir.1994). Because the meaning of any statute is informed by its context, *Brown v. Gardner,* 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (citing *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991)), a court engaged in statutory interpretation may examine not only the "bare meaning" of the words but also their "placement and purpose in the statutory scheme." *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *see also Smith v. Brown,* 35 F.3d at 1522–23.

The special rule provides that "[s]ubject to any applicable statute of limitation not having expired with regard to either a tax underpayment or a tax overpayment, *the amendments made by this section* [section 3301 of the 1998 Act] shall apply to periods beginning before the date of the enactment of this Act ...." Pub.L. No. 105–206, § 3301(c)(2), 112 Stat. 685, 741 (1998) (emphasis added). In other words, the special rule, by its own terms, applies section 6621(d) to past periods, and the IRS acknowledges that despite the absence of any language addressing statutes of limitations, section 6621(d) permits global interest netting for future periods as long as at least one of the relevant statutes of limitations remains open.

Defendant emphasizes the difficulty of including closed years in netting calculations. Because the IRS is now on notice as to the need to preserve tax records for netting purposes, no special statute of limitations rule is necessary. However, for past periods, where the IRS was not on notice, defendant claims that the special rule accommodates these administrative difficulties by limiting the availability of netting to open years. It may indeed be true that it is more difficult for the IRS to include pre-enactment time-barred years than post-enactment time-barred years

in its calculations, but Congress appears to have accommodated this issue by placing the burden of seeking global interest netting for past periods squarely on the taxpayer, rather than on the IRS, and by setting a deadline for petitions. *See* Pub.L. No. 105–206, § 3301(c)(2)(A), (B), 112 Stat. at 741. Had Congress wished also to impose a more restrictive rule addressing statutes of limitations, it could have done so in this manner. Defendant's effort to prescribe a limitation on the use of the special rule must be rejected because the language of section 6621(d)— which the special rule incorporates—affords no principled basis upon which to distinguish between that section's prospective and retrospective applications. ·

## CONCLUSION

For the reasons set forth above, plaintiff's motion for partial summary judgment is granted and defendant's cross-motion is denied. On or before June, 2003, the parties shall file a stipulation as to the amount due plaintiff based on this opinion.