**FEDERAL NATIONAL MORTGAGE ASSOCIATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 00–369T.**

United States Court of Federal Claims.

Dec. 5, 2005.

Thomas D. Johnston, Alan I. Horowitz, and Laurie Barber, Miller & Chevalier, Chartered, Washington, DC, attorneys of record for plaintiff.

Jennifer P. Wilson, with whom were Assistant Attorney General Eileen J. O'Connor and Acting Chief David Gustafson, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

This is a tax refund suit. Plaintiff, the Federal National Mortgage Association ("Fannie Mae"), seeks to recover additional statutory interest in the amount of $4,940,328 on an overpayment of federal income tax for the taxable year ending December 31, 1974. The case is now before the court on cross-motions for summary judgment following a decision of the Federal Circuit, entered August 12, 2004, reversing this court's grant of partial summary judgment in plaintiff's favor and remanding the matter for a determination as to whether the statute of limitations applicable to plaintiff's 1983 tax underpayment year was still open on July 22, 1998. *Federal Nat'l Mortgage Ass'n v. United States*, 379 F.3d 1303, 1311 (Fed.Cir.2004). For the reasons set forth below, we conclude that the statute of limitations applicable to plaintiff's 1983 underpayment year was closed on July 22, 1998, and therefore grant defendant's cross-motion for summary judgment.

## BACKGROUND

### A.

Under the Internal Revenue Code ("IRC"), corporate taxpayers are assessed a higher interest rate on tax underpayments than they receive from the Internal Revenue Service ("IRS") on tax overpayments. I.R.C. §§ 6621(a)(2), 6621(c).[1] When overlapping periods of tax underpayments and tax overpayments result in a zero net debt, however, section 6621(d) entitles taxpayers to the application of a zero net interest rate. This pairing of tax overpayment years with tax underpayment years for the purpose of interest equalization is referred to as "global interest netting."

Section 6621(d) was enacted as part of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub.L. No. 105–206, § 3301(a), 112 Stat. 685, 741. The enactment of that section was accompanied by an uncodified "special rule" allowing taxpayers to apply section 6621(d) to periods prior to the statute's effective date (July 22, 1998) "subject to any applicable statute of limitations not having expired with regard to either a tax underpayment or a tax overpayment." Pub.L. No. 105–206, § 3301(c)(2), 112 Stat. 685, 741 (1998), as amended by Pub.L. No. 105–277, § 4002(d), 112 Stat. 2681–906 (1998).

In an earlier phase of this litigation, we were called upon to decide whether application of that special rule required that both limitations periods remain open—*i.e.*, the underpayment year as well as the overpayment year—or whether it was sufficient for only one of the years to remain open in order to employ global interest netting. We concluded that the rule, although ambiguous, was nevertheless part of a remedial statute and, as such, was to be read in the taxpayer's favor. *Federal Nat'l Mortgage Ass'n v. United States*, 56 Fed.Cl. 228, 238 (2003). Accordingly, we held that plaintiff was entitled to the interest equalization contemplated by the special rule for overlapping periods of mutual indebtedness between the taxpayer and the IRS occurring prior to 1998 so long as the statute of limitations on either the overpayment year or the underpayment year was still open as of July 22, 1998. *Id.* at 239.

On appeal, the Federal Circuit reversed our decision, holding that the ambiguity in the statute could not be resolved in the taxpayer's favor. *Federal Nat'l Mortgage Ass'n*, 379 F.3d 1303. The court concluded that since the special rule could as readily be interpreted as requiring both limitations pe-

---

1. The Internal Revenue Code comprises Title 26 of the United States Code.

riods to be open as requiring that only one of the periods be open, principles of sovereign immunity compelled the more restrictive reading. The court explained: "[T]ime bars, when they condition recovery from the government, are strictly construed." *Id.* at 1310. In accordance with this determination, the Federal Circuit issued a remand to this court limited to "a factual determination regarding whether the statute of limitations for the 1983 underpayment year was closed on July 22, 1998." *Id.* at 1311.[2]

### B.

Plaintiff filed its federal income tax return for taxable year 1983 on or before September 15, 1984. Following an audit of the return by the IRS, the parties executed a succession of Form 872s ("Consent to Extend the Time to Assess Tax") which cumulatively extended the limitations period for making assessments to plaintiff's 1983 taxable year until March 15, 1989. In November 1988 (prior to the expiration of the last extension then in effect), plaintiff and the IRS agreed to an indefinite extension of the limitations period for making assessments to plaintiff's taxable year 1983 by executing a Form 872–A ("Special Consent to Extend the Time to Assess Tax").

The IRS audit of plaintiff's 1983 tax return resulted in a revenue agent's report issued in February 1988, asserting that plaintiff owed additional tax. Subsequent adjustments were made following plaintiff's protest to an IRS appeals office.

In December 1990, plaintiff reached a partial agreement with the IRS on the disputed issues for the 1983 taxable year. That agreement was reflected in the parties' execution on December 14, 1990, of a Form 870–AD ("Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and of Acceptance of Overassessment"). Specifically, plaintiff consented to the assessment and collection of a proposed deficiency in tax of $59.5 million, plus interest of $66.7 million, but reserved the right to file claims for refund or credit based on certain issues related to two cases pending in the United States Tax Court.[3] The Form 870–AD also included language of finality stating that if plaintiff's offer of compromise were accepted by the Commissioner, then the case would not be reopened except in the event of certain stated contingencies.[4]

Following execution of the Form 870–AD, the IRS notified plaintiff by letter dated December 21, 1990, that the IRS Washington Appeals Office was closing its case file for plaintiff's 1983 taxable year "on the basis agreed upon." The IRS's letter was accompanied by a "closing agreement" acknowledging the parties' resolution with finality of

---

**2.** At the time this suit was filed, plaintiff had overpayments of tax for the taxable years 1974 and 1975 that overlapped with underpayments of tax for its taxable years 1983 and 1986. It is only the taxable year 1983 that now remains at issue.

**3.** The reservation reads in full as follows:

The taxpayer reserves the right to timely file claims for refund or credit or prosecute timely filed claims solely on the grounds that:

(1) If the decision of the Tax Court upholding the taxpayer's position regarding the concurrent mortgage sale issue becomes final under I.R.C. Section 7481, gross income for 1983 does not include the purchase discount amortization of $172,467.

(2) If the decision of the Tax Court upholding the taxpayer's position regarding the concurrent mortgage sale issue is reversed by the U.S. Supreme Court, gross income for 1983 does not include the purchase discount amortization of $18,306,685.

(3) To the extent that the character, timing or amount of the hedging losses in issue for

1984 and 1985 are in any respect affected by a decision of the Tax Court that becomes final under I.R.C. Section 7481, the taxpayer is entitled to reflect the treatment of $8,746,914 of its hedging gains reported for 1983 on the same basis.

**4.** The language of finality reads in full as follows:

If this offer is accepted for the Commissioner, the case shall not be reopened in the absence of fraud, malfeasance, concealment or misrepresentation of material fact, an important mistake in mathematical calculation, deficiencies or overassessments resulting from adjustments made under Subchapters C and D of Chapter 63 concerning the tax treatment of partnership and Subchapter S items determined at the partnership and corporate level, or excessive tentative allowances of carrybacks provided by law; and no claim for refund or credit shall be filed or prosecuted for the year(s) stated above other than for amounts attributed to carrybacks provided by law.

the specific tax matters that had been the subject of dispute. On December 31, 1990, plaintiff delivered a check to the IRS for $126.2 million in advance payment of the proposed deficiency of $59.5 million, plus interest of $66.7 million, agreed upon in the Form 870–AD. These amounts were assessed on January 31, 1991. No payments or credits were posted to plaintiff's account for its taxable year 1983 after December 31, 1990.

In June 1994, after the litigation before the Tax Court had become final, plaintiff filed a refund claim, Form 1120X, based on one of the grounds reserved in the Form 870–AD and for the amount specified therein. Plaintiff explained the factual circumstances leading up to this refund claim, in pertinent part, as follows:

> On December 12, 1990, Form 870–AD was signed, consenting to the assessment of tax for 1983. Additional provisions were added to the Form 870–AD whereby the taxpayer reserved the right to file claims for refund for 1983 based on three occurrences related to pending matters before the Tax Court. The matters before the Tax Court involved two different docketed cases. The outcome of the three provisions could not be determined until the decisions of the two cases became final. The decision in the second case became final on May 24, 1994. Of the three provisions, only the first one requires a claim for refund.

On or before May 1, 1995, the IRS, by examination, abated $79,335 in tax with respect to taxable year 1983 as requested by plaintiff's refund claim and refunded plaintiff the resulting tax overpayment with interest. (According to the IRS tax transcript for plaintiff's 1983 taxable year (Form 4340—"Certificate of Assessments, Payments, and Other Specified Matters"), the refund amount consisted of $79,335 in overpaid tax, $85,557.92 in overpaid deficiency interest,

and $58,294.90 in interest on the overpayments of tax and interest.) Based on the May 1, 1995, refund and in accordance with the Form 872–A, the IRS noted in plaintiff's tax transcript that the statute of limitations for assessment of tax had been extended to July 29, 1995, i.e., that the limitations period would expire 90 days after the overassessment date of the decrease in tax. Plaintiff, however, received no formal notification of this transcript entry.

Prior to December 31, 1999, plaintiff filed a request with the IRS for application of a zero interest rate under section 6621(d), seeking to offset its 1983 underpayment with a 1974 overpayment. In a letter dated July 20, 2000, and identified as a "Final Determination," the IRS disallowed the request, explaining that interest netting required "that the statute of limitations for refund ... be open on July 22, 1998, on both the overpayment and underpayment periods." The IRS went on to point out that this requirement was not satisfied here since the "statute[ ] for [the] tax period[ ] ending December 31, 1983[had] expired." [5] It is the correctness of this ruling that is now before us.

## DISCUSSION

■ The question we have been directed to decide is whether the statute of limitations for the filing of a refund claim for plaintiff's taxable year 1983 remained open as of July 22, 1998, the enactment date of section 6621(d). The issue turns on whether the Form 872–A—the indefinite extension for the assessment of tax for plaintiff's taxable year 1983 that the parties executed in November 1988—was still in effect as of that date. We conclude that it was not.

According to the language of the Form 872–A, there are three ways the indefinite extension of the limitations period could have

---

5. As of January 1, 1987, plaintiff had an underpayment of tax in the amount of $82,602,363 (including accrued interest) for the 1983 taxable year. This underpayment overlapped with an $82,602,363 portion of an overpayment for the 1974 taxable year. The full amount of the 1983 underpayment, with accrued interest, continued to overlap with a portion of the overpayment for the 1974 taxable year for the entire period from

January 1, 1987, to December 31, 1990. The amount of additional overpayment interest that would result from application of a zero net interest rate to these overlapping underpayment and overpayment amounts, pursuant to sections 6611 and 6621(d) of the Internal Revenue Code, is approximately $4,940,328, as of December 31, 1990, the sum plaintiff now seeks to have refunded.

been ended. First, pursuant to Paragraph 1, plaintiff or the IRS could have terminated the agreement by issuing a Form 872–T ("Notice of Termination"). Second, pursuant to the same paragraph, the IRS could have terminated the agreement by issuing a notice of deficiency. Finally, pursuant to Paragraph 2, the agreement could have expired on the assessment date of an increase in tax or the overassessment date of a decrease in the tax that "reflects the final determination of tax and the final administrative appeals consideration." [6]

Plaintiff contends that Form 872–A's indefinite extension for assessment of tax remains in effect to this day because none of the conditions prescribed for its termination ever occurred. Specifically, plaintiff points out that neither party ever delivered a Form 872–T to the other; the IRS never mailed to plaintiff a notice of deficiency for the tax period in question; and the IRS never made an assessment of either an increase or a decrease in tax that could be regarded as "the final determination of tax and the final administrative appeals consideration."

Defendant disagrees. Defendant contends that the extension expired pursuant to paragraph 2 of the Form 872–A, specifically, on the overassessment date of a decrease in plaintiff's tax for 1983—an event defendant claims occurred on or about May 1, 1995, when the IRS abated $79,335 in tax. That decrease in tax, defendant maintains, establishes the final resolution of the issues reserved in the Form 870–AD and therefore reflects the "final determination and appeals

consideration" for plaintiff's 1983 taxable year.

The Form 870–AD was executed by the parties in December 1990 following an audit by the IRS of plaintiff's taxable year 1983 that resulted in a determination of additional income tax owed in the amount of $59,493,854. Plaintiff accepted that determination and, as evidenced by the Form 870–AD, consented to the assessment and collection of that amount, together with interest. Significant to our resolution of the present issue is the language in the Form 870–AD which stated that if the taxpayer's offer to accept the assessment is accepted by the Commissioner of Internal Revenue, then "the case shall not be reopened" except for certain enumerated contingencies. Among these enumerated contingencies was plaintiff's reservation of a right to claim a refund of a stated dollar amount solely on the basis of alternative resolutions of certain contested tax issues then awaiting decision before the Tax Court.

Read in light of the attendant facts, the Form 870–AD's language—"the case shall not be reopened in the absence of" and "the taxpayer reserves the right to file claims for refund ... solely on the grounds that"— expresses a mutual commitment to accept as the final determination of plaintiff's 1983 income tax liability an after-refund amount calculated on the basis of audit-verified income data.[7] Thus, the issuance of a refund check in the claimed amount corresponds to the final determination and appeals consideration for plaintiff's 1983 taxable year and, accord-

---

**6.** Paragraphs 1 and 2 of Form 872–A reads as follows:

(1) The amount(s) of any Federal Income tax due on any return(s) made by or for the above taxpayer(s) for the period(s) ended 12/31/83 ... may be assessed on or before the 90th (ninetieth) day after: (a) the Internal Revenue Service office considering the case receives Form 872–T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer(s); or (b) the Internal Revenue Service mails Form 872–T to the taxpayer(s); or (c) the Internal Revenue Service mails a notice of deficiency for such period(s) ....

(2) This agreement ends on the earlier of the above expiration date or the assessment date of an increase in the above tax or the overassessment date of a decrease in the above tax that

reflects the final determination of tax and the final administrative appeals consideration.... Some assessments do not reflect a final determination and appeals consideration and therefore will not terminate the agreement before the expiration date. Examples are assessments of: (a) tax under a partial agreement; (b) tax in jeopardy; (c) tax to correct mathematical or clerical errors; (d) tax reported on amended returns; and (e) advance payments.

**7.** The exclusion of $172,467 in purchase account amortization from gross income, as anticipated by the first reservation provision in Form 870–AD, resulted in a simple arithmetic calculation to derive the $79,335 in overpaid tax ultimately refunded.

ingly, brings to a close, 90 days after the date of refund, the period for the assessment of tax as contemplated by Form 872–A.

Plaintiff disagrees with this analysis. Form 872–A, plaintiff maintains, is intended to provide certainty with respect to the ending date of an indefinite extension; hence, the form restricts termination of the extension to specific, identifiable events. In plaintiff's view, however, the issuance of a refund check is not among these identified events because the check itself does not reflect a "final determination" of the taxpayer's tax liability. In support of this point, plaintiff points out that every year, millions of individual taxpayers file personal income tax returns on which they report an amount of tax withheld that exceeds their tax liability. These returns are processed by the IRS and refunds are issued on the basis of the information reported on the return. But such refunds, plaintiff goes on to say, do not represent a final determination by the IRS of the taxpayer's tax liability. Rather, they represent what plaintiff describes as simply a "preliminary" determination under which the IRS retains the power to audit the return and to redetermine the taxpayer's tax liability. These same conditions, plaintiff maintains, apply here: plaintiff filed an amended tax return claiming a refund, and the IRS processed the return and issued a check on or about May 1, 1995. Plaintiff argues, however, that such a refund was not a "final determination" of tax liability, for in the absence of some other communication from the IRS evidencing finality, the IRS necessarily retained the power to redetermine plaintiff's liability.

Plaintiff is correct that the issuance of a refund check to a taxpayer does not foreclose the IRS from subsequently seeking its recovery on the ground that the refund was erroneously paid. I.R.C. § 7405(b) ("Any portion of a tax imposed by this title which has been erroneously refunded . . . may be recovered by civil action brought in the name of the United States."). In this case, however, the refund followed in accordance with an agreement concluded after both an IRS audit and an appeals process had been completed and the taxpayer's tax liability had been estab-

lished. The refund, in other words, reflected an agreed-upon adjustment whose amount flowed inevitably from the numbers established by the audit, the finality of which was acknowledged by the IRS's letter of December 21, 1990, notifying plaintiff that the Washington Appeals Office was closing its file for the taxpayer's 1983 taxable year "on the basis agreed upon."

On these facts, the date of issuance of the refund to plaintiff is reasonably to be understood as the "overassessment date of a decrease in . . . tax" and the refund itself is logically construed as an administrative action that "reflects the final determination of tax and the final administrative appeals consideration." In accordance with this conclusion then, the period for assessment of tax, as agreed to in Form 872–A, ended 90 days after the May 1, 1995, refund date.

In reaching our conclusion, we remain mindful of plaintiff's contention that Form 872–A endeavors to ensure certainty in the determination of the ending date of an indefinite extension by identifying that date through some form of clear notice such as a Form 872–T or a notice of deficiency. The difficulty with this argument, however, is that it fits only with the first paragraph of the form. The second paragraph by contrast, which contains the words "reflects the final determination of tax," looks beyond the clear notice concept of paragraph one and requires instead an assessment of the parties' conduct—both their words and actions— to determine whether a particular course of dealing culminated in an action that "reflects the final determination of tax." On the current facts, it is difficult to see how one could regard as "preliminary" or "provisional" a refund issued pursuant to a right reserved as part of an otherwise final tax determination, whose amount was directly anticipated by the sums confirmed by the parties' agreement. When the IRS advised plaintiff that it was closing its files "on the basis agreed upon," that assertion necessarily took into account the future refund as well.

## CONCLUSION

For the reasons set forth above, we conclude that the statute of limitations with

regard to plaintiff's 1983 tax year was closed as of July 22, 1998. Accordingly, plaintiff is not entitled to the netting of the interest payments identifiable with its 1974 tax over-payments and its 1983 tax underpayments. We therefore dismiss plaintiff's motion for summary judgment, grant defendant's cross-motion for summary judgment, and direct that the complaint be dismissed with prejudice.